**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REBELUTION, LLC,

        Plaintiff,

  v.

ARMANDO C. PEREZ, et al.,

        Defendants.

————————————————————/

No. C 09-3979 MHP

**MEMORANDUM & ORDER**

**Re:  Defendants' Amended Motion for
Summary Judgment**

On August 27, 2009, plaintiff Rebelution, LLC, filed suit against various defendants alleging that defendants' use of the term "Rebelution" constitutes, *inter alia*, trademark infringement and unfair competition under both federal and state law.  Now before the court is defendants' amended motion for summary judgment.  Having considered the parties' submissions and arguments, and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

Plaintiff is a reggae band from Santa Barbara, California that blends traditional reggae with hip-hop and alternative rock music.[1]  Docket No. 1 (Complaint) ¶¶ 12–14.  Since its formation in 2004, the band has used the name "Rebelution" when doing business in the United States and abroad.  *Id.*  Specifically, plaintiff has used the name in commerce in connection with downloadable musical sound recordings, pre-recorded compact discs, live performances, merchandising, clothing and other related products and services.  *Id.*  In addition, plaintiff has also used the name "Rebelution" in connection with the general advertising and promotion of its music.  *Id.* ¶ 16.

**United States District Court**
For the Northern District of California

On September 15, 2006, after plaintiff released its first and self-titled album entitled "Rebelution," band-member Marley Williams applied to register the word rebelution with the United States Patent and Trademark Office (USPTO). *Id.* ¶ 18. The USPTO approved the application and issued a Certificate of Register dated December 25, 2007 for the following mark:



*Id.*, Exh. A (Trademark certificate). The registration applies to, *inter alia*, downloadable musical sound recordings, musical sound recordings and pre-recorded compact discs. *Id.* Williams later assigned the mark to plaintiff. *Id.* ¶ 20; *see id.*, Exh. B (Mark assignment).

Since the release of its second album, "Courage to Grow" in 2007, plaintiff has enjoyed increasing success. The album: 1) peaked at number four on the Billboard reggae chart; 2) won the iTunes Editor's Choice Award for Best Reggae Album of 2007; and 3) appeared on both the iTunes and Billboard reggae charts. *Id.* ¶ 19. In 2009, plaintiff released its third album "Bright Side of Life," which peaked as the number one reggae album in the United States. *Id.* ¶¶ 21–22. Plaintiff is scheduled to play several large summer festivals in 2010, including the Bonnaroo Music and Arts Festival, and Lollapalooza. Docket No. 153 (Supp. Carey Dec.) ¶¶ 5–6.

Defendant Armando Perez performs high energy hip-hop and latin dance music under the moniker Pitbull. Docket No. 131 (Motion) at 2–3. He has released four albums which, together, have sold in excess of 5.4 million copies. *Id.* Three singles from Perez's most recent album have reached the top of the Billboard Top 100 chart and are on heavy rotation at radio stations across the country. *Id.* at 8. Perez's music videos are aired on national music networks such as MTV, VH1 and BET. *Id.* at 2. Perez has been awarded an American Latino Media Arts award for the top musical performance by a Latin Artist, Docket No. 161 (Stipulated Facts) ¶ 2, has performed his music on television, *id.*, and has been featured in various national publications, *id.* ¶ 3. Perez's most recent record, released by Sony Music Entertainment in 2009, uses the word rebelution in its title.

United States District Court

For the Northern District of California

1   Specifically, the album cover has an image of Perez and a camouflaged woman, and includes the

2   following:



7   Docket No. 84 (Defendants' Exhibits), Exh. C (Album Cover).  This lawsuit followed.

9   LEGAL STANDARD

10          Summary judgment may be granted only when, drawing all inferences and resolving all

11  doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving

12  party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see generally Anderson v.*

13  *Liberty Lobby, Inc.*, 477 U.S. 242, 247–55 (1986).  A fact is "material" if it may affect the outcome

14  of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a

15  reasonable jury could return a verdict for the non-moving party.  *Id.* at 248.  The court may not make

16  credibility determinations.  *Id.* at 255.  The moving party bears the burden of identifying those

17  portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of

18  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its

19  initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or

20  discovery, set forth specific facts showing that there is a genuine issue for trial.  Fed R. Civ. P. 56(e);

21  *see Anderson*, 477 U.S. at 250.

23  DISCUSSION

24          Defendants make two arguments in support of their motion for summary judgment:  1) Perez

25  is entitled to First Amendment protections for his use of the word rebelution; and 2) no reasonable

26  jury could find a likelihood of confusion.[2]  Each is discussed and rejected in turn.

3

United States District Court

For the Northern District of California

I.       First amendment

Defendants claim that the test articulated in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), applies here because Perez's use of the word rebelution from plaintiff's mark was in connection with an artistic work.  In *Rogers*, the Second Circuit announced that because of an artist's significant First Amendment interest in choosing an appropriate title for his artistic work, the Lanham Act "[s]hould be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."  875 F.2d at 999.  With respect to allegedly misleading titles, "that balance will not support application of the [Lanham] act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or content of the work."  *Id.*  The Ninth Circuit has adopted the *Rogers* test, however, it has placed an important threshold limitation upon its application:  plaintiff's mark must be of such cultural significance that it has become an integral part of the public's vocabulary.

In the Ninth Circuit, the seminal case of *Mattel Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), centered around a European band's repeated use of the word Barbie in a song.  Chief Judge Kozinski found that although "[w]hatever First Amendment rights you may have in calling the brew you make in your bathtub 'Pepsi' are easily outweighed by the buyer's interest in not being fooled into buying it. . . . [t]he problem arises when trademarks transcend their identifying purpose.  Some trademarks enter our public discourse and become an integral part of our vocabulary.  How else do you say that something's 'the Rolls Royce of its class'?  What else is a quick fix, but a Band-Aid?  Does the average consumer know to ask for aspirin as 'acetyl salicylic acid'?"  *Id.* at 900 (quotation and citation omitted).  The Ninth Circuit went on to hold that "when a trademark owner asserts a right to control how we express ourselves—when we'd find it difficult to describe the product any other way (as in the case of aspirin), or when the mark (like Rolls Royce) has taken on an expressive meaning apart from its source-identifying function—applying the traditional test fails to account for the full weight of the public's interest in free expression."  *Id.*  Thus, the court adopted the *Rogers* test to address marks that have entered the cultural lexicon because "the

4

United States District Court

For the Northern District of California

trademark owner does not have the right to control public discourse whenever the public imbues his

mark with a meaning beyond its source-identifying function." *Id.*

Similarly, in *Mattel Inc. v. Walking Mountain Prod.*, 353 F.3d 792 (9th Cir. 2003), Judge

O'Scannlin reaffirmed the holding in *MCA Records*:

> [W]hen marks transcend their identifying purpose and enter public discourse and
> become an integral part of our vocabulary, they assume a role outside the bounds of
> trademark law. *Where a mark assumes such cultural significance, First Amendment
> protections come into play.* In these situations, the trademark owner does not have
> the right to control public discourse whenever the public imbues his mark with a
> meaning beyond its source-identifying function.
>
> As we determined in *MCA*, Mattel's 'Barbie' mark has taken on such a role in our
> culture. . . . Recognizing that First Amendment concerns in free expression are
> particularly present in the realm of artistic works, we rejected Mattel's claim. In
> doing so, we adopted the Second Circuit's First Amendment balancing test for
> applying the Lanham Act to titles of artistic works as set forth in *Rogers v. Grimaldi*,
> 875 F.2d 994, 999 (2d Cir. 1989).

*Id.* at 807 (emphasis added) (internal quotations and citations omitted). Thus, *Walking Mountain*

also requires the mark to have cultural significance for First Amendment protections to apply.

There is no evidence that the word rebelution or plaintiff's mark has entered the public

discourse or become an integral part of our vocabulary. Nor has either been imbued by the public

with an alternate meaning. Indeed, according to defendants, there is no uniform meaning associated

with either the word or the mark. Consequently, since neither the word nor the mark have "taken on

an expressive meaning apart from its source-identifying function," *MCA Records*, 296 F.3d at 900,

no First Amendment rights are implicated and the *Rogers* test is inapplicable.

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008), is

inapposite because the parties there did not dispute whether the *Rogers* test was applicable. *Id.* at

1099–1100 ("ESS concedes that the Game is artistic and that therefore the *Rogers* test applies."); *see

also Lite Breeze, Inc. v. Britney Spears*, No. 04-0326, slip op. at 10 (S.D. Cal. Mar. 21, 2005)

("Plaintiff does not dispute application of the [artistic relevance] test to the facts of this case . . . .").

Here, plaintiff disputes the application of the *Rogers* test. Docket No. 168 (Opposition) at 23 n.12.

*Rogers* is also inapplicable based on language in the decision itself. It found that "[p]oetic

license is not without limits. The purchaser of a book, like the purchaser of a can of peas, has a right

5

United States District Court

For the Northern District of California

1    not to be misled as to the source of the product. . . . Books are sold in the commercial marketplace

2    like other more utilitarian products, making the danger of consumer deception a legitimate concern

3    that warrants some government regulation." 875 F.2d at 997–98; *see Silverman v. CBS Inc.*, 870

4    F.3d 40, 49 (2d Cir. 1989) ("[t]rademark protection is not lost simply because the allegedly

5    infringing use is in connection with a work of artistic expression."). Therefore, *Rogers* explicitly

6    held that its "[l]imiting construction [of the Lanham Act] would not apply to misleading titles that

7    are confusingly similar to other titles. The public interest in sparing consumers this type of

8    confusion outweighs the slight public interest in permitting authors to use such titles." 875 F.2d at

9    999 n.5. Thus, the relevant question is whether Perez's use of the word rebelution in his album title

10   is confusingly similar to the title of plaintiff's album and band name. This determination is made by

11   application of the *Sleekcraft* factors. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 350 n.7 (9th

12   Cir. 1979) ("'Confusing similarity' is another way of stating the 'likelihood of confusion'"). As

13   discussed below, since there exists a likelihood that the album titles could be confusingly similar, the

14   First Amendment protections offered by *Rogers* do not apply.

15          Even if the *Rogers* test was applicable, Perez's arguments would fail. The test prohibits

16   application of the Lanham Act to titles of artistic works unless the title "has no artistic relevance to

17   the underlying work whatsoever or, if it has some artistic relevance, unless the title explicitly

18   misleads as to the source or the content of the work." 875 F.2d at 999. Perez is unable to

19   demonstrate the first prong, which requires the artistic relevance of defendant's use to be with

20   reference to the meaning associated with *plaintiff's* mark. In every federal court of appeals case

21   addressing the artistic adoption of plaintiff's non-generic mark, the artistic relevance of defendant's

22   use of the mark related to the meaning associated with plaintiff's mark. *See e.g.*, *Rogers*, 875 F.2d at

23   996–97 (movie title referring to plaintiff Ginger Rogers); *Cliff Notes v. Bantam Doubleday Dell Pub.*

24   *Group*, 886 F.2d 490, 491 (2d. Cir. 1989) (publication allegedly parodying plaintiff's publication

25   named Cliff Notes); *Twin Peaks Prods., Inc. v. Pubs. Int'l, Ltd.*, 996 F.3d 1366, 1370 (2d. Cir. 1992)

26   (book title referring to plaintiff's television series named Twin Peaks); *MCA Records*, 296 F.3d at

27   899 (band referring to plaintiff's famous doll, Barbie); *ETW Corp. v. Jireh Pub., Inc.,* 332 F.3d 915,

28

918–19 (6th Cir. 2003) (painting referring to plaintiff Tiger Woods); *Walking Mountain Prod.*, 353 F.3d at 796 (photographer referring to plaintiff's famous doll, Barbie); *Rock Star Videos*, 547 F.3d at 1097 (video game maker allegedly referring to plaintiff's strip club). Defendants must thus show that they used plaintiff's mark to refer to the meaning associated with plaintiff's mark. No such showing has been made.

It would be difficult, if not impossible, for Perez to demonstrate that he intended to refer to plaintiff when he used plaintiff's mark. Perez concedes that prior to releasing his album, he had never heard of plaintiff. Defendants' Exhibits, Exh. D (Perez Aff.) ¶ 4. Instead, Perez adopted the word rebelution because he saw it on a store front in Miami: "I was driving by, and I seen it, and I said, Wow, that is a great word, because it had everything to do with me in the music business, my family in Cuba and me just as a fighter in general." Docket No. 128 (Perez Depo.) at 11:20–24. Perez also claims that "Rebelution" symbolizes the struggle in his life, and is a made-up word that is an amalgamation of some subset of the words rebel, revolution, and evolution. *Id.* at 45:10–18, 171:10–17; Perez Aff. ¶ 3. Importantly, nowhere does any defendant claim that defendants' use refers to plaintiff or the reggae band Rebelution.

Defendants reliance upon *Roxbury Entertainment v. Penthouse Media Group*, 669 F. Supp. 2d 1170 (C.D. Cal. 2009), is unpersuasive. At issue there was defendants' use of the term "Route 66," a mark from a 1970s television program. The court held: "With respect to the first prong [of *Rogers*], Defendants' use of 'Route 66' is relevant to the underlying work. Defendants have introduced evidence demonstrating at least some relationship between the mental imagery associated with the term 'Route 66,' e.g., road trips, cross-country travel, and the content of Defendants' movie." *Id.* at 1175–76 (internal citation omitted). Thus, *Roxbury* too relates to defendants' reference to the meaning associated with plaintiff's mark. Perez's argument—that the content of his album bears relevance to *his* interpretation of the word rebelution—is therefore unsupported by *Roxbury*. This argument, at its logical conclusion, would allow any person to ascribe their own meaning to a mark and thereafter argue that their artistic work bears relevance to this opportunistically-defined meaning. Indeed, it would allow defendants to co-opt the most fanciful

7

United States District Court

For the Northern District of California

marks—marks afforded great protection under trademark law—as those marks are the most susceptible to differing interpretations.  That is not the law.  The court now turns to defendants' contention that no likelihood of confusion exists here.

II.    Likelihood of confusion

Under the Lanham Act, a trademark is defined as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others."  15 U.S.C. § 1127.  In other words, a trademark identifies the source of particular goods and services, i.e., a brand name.  *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534, 1536 (9th Cir. 1989).

In order to prevail on its trademark claims, plaintiff must show that defendants' use of its mark creates a likelihood of confusion among consumers.  15 U.S.C. § 1125(a); *see Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) ("The critical determination is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." (internal quotations omitted)).  This likelihood of confusion analysis is the relevant test for all claims at issue here.  *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical[:] is there a 'likelihood of confusion?'").

"Likelihood of confusion is a factual determination."  *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002).  Eight factors are relevant to determining whether confusion is likely:  1) strength of the mark; 2) proximity of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) type of goods and the degree of care likely to be exercised by the purchaser; 7) defendant's intent in selecting the mark; and 8) likelihood of expansion of the product lines.  *Sleekcraft*, 599 F.2d at 348–49.  Both federal and state trademark claims are analyzed using these factors.  *Jada Toys*, 518 F.3d at 632.  A likelihood of confusion determination may rest on all eight factors or, alternatively, on only those factors that are most pertinent.  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005) ("[T]he test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made

with respect to some of them.").  In assessing the likelihood of confusion to the consuming public, the standard used by the courts is "the typical buyer exercising ordinary caution."  *Sleekcraft*, 599 F.2d at 353.  Each of the eight *Sleekcraft* factors is addressed in turn.

A.      Strength of Mark[3]

Trademarks fall into a spectrum comprising five categories.  A strong mark "is inherently distinctive, for example, an arbitrary or fanciful mark" and is "entitled to a greater degree of protection than a weak one, because of its unique usage." *Id.* at 349.  A weak mark is merely descriptive and is protected only when secondary meaning is shown. *Id.*  "The two strongest sets of marks are 'arbitrary' or 'fanciful' marks, which trigger the highest degree of trademark protection." *Surfvivor*, 406 F.3d at 631.  Arbitrary marks are common words having no connection with the actual product.  Fanciful marks, for example "Kodak" or "Aveda," are "coined phrases" having no commonly known connection with the associated product. *Id.* at 632.  Marks falling into a third category, "suggestive" marks, "do not describe the product's features but suggest them. . . . The exercise of some imagination is required to associate a suggestive mark with the product." *Id.*  The fourth and fifth categories of trademark are "descriptive" and "generic" marks, respectively. *Id.*

Plaintiff's mark appears, at first blush, to be fanciful.  The word rebelution is a made up term; it is not in the dictionary and has no commonly known connection with music recordings.  Indeed, as discussed above, Perez himself has ascribed multiple different meanings to the word rebelution.  For the same reasons, the mark is not purely descriptive or generic.  However, as a rather obvious amalgamation of the common words rebel and revolution, or of rebellion and revolution, the word rebelution is not very fanciful.  In fact, the amalgamation could render the mark suggestive, because with the exercise of some imagination, a typical music buyer could associate the word rebelution with the rogue spirit of some types of music.  Consequently, the strength of the mark lies somewhere between the suggestive and fanciful categories.  It is semi-strong.

Defendants' reliance on *Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344 (N.D. Ill. 1996), and *Pump, Inc. v. Collins Mgmt., Inc.*, 746 F. Supp. 1159 (D. Mass. 1990), to establish the mark as weak is unpersuasive.  In *Tsolis*, the use of a mark incorporating the word aftermath, which

United States District Court

For the Northern District of California

generally refers to the consequences of an event, was found not to implicate trademark concerns because of the word's commonplace nature.  946 F. Supp. at 1352 ("the court finds that the term 'aftermath' is a term undeserving of trademark protection.").   The *Pump* court, which analyzed a mark incorporating the common word pump, used a different standard than used in the Ninth Circuit to determine the strength of the mark; consequently, it is inapposite with respect to this prong.  746 F. Supp. at 1170–71 (determined strength of the mark by analyzing "(1) the length of time it has been used and the plaintiff's renown in its field; (2) the strength of the mark in the field; and (3) the plaintiff's actions in promoting its mark.").   Thus, neither *Tsiolis* nor *Pump* affects the strength of mark analysis since the mark at issue is not a common word.  Due to this fundamental difference, defendants' reliance on these cases for this factor, as well as for the broad proposition that an established band has *carte blanche* to use the component parts of others' marks in its own album name, is misguided.  Indeed, "a lack of commercial strength cannot diminish the overall strength of a conceptually strong mark so as to render it undeserving of protection.  Otherwise, a mark which is conceptually strong may never have the opportunity to blossom into its full commercial potential through effective marketing."  *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1081 (9th Cir. 2005).  The fact that plaintiff's music does not have the extent of commercial success attributed to defendants' music does not significantly alter the analysis.

Defendants have, however, presented evidence that the mark was weakened by third-party use by pointing to five other federal trademark registrations for the word rebelution along with numerous other third-party uses.[4]  Only uses within the relevant industry actually weaken the mark.  *Id.* at 1088 ("[u]se of similar marks by third-party companies in the relevant industry weakens the mark at issue."); *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990) ("Evidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law.").  Since the relevant industry here is unquestionably the music industry, the following evidence is irrelevant:  1) registration of "Rebelution" for the sale of tee-shirts and hats, and hair care products; 2) the registration of "The Rebelution" and the existence

United States District Court

For the Northern District of California

of www.therebelution.com for use with digital audio tapes associated with a Christian organization aimed at teenagers; 3) the registration of "Rebelution Design" for the purposes of clothing; and 4) the naming of a scholarship fund as "Rebelution" by the University of Nevada.  Defendants' Exhibits, Exh. G (Wolfe Aff.) ¶¶ 28–33.

There remain five artists that all released albums named "Rebelution" prior to plaintiff's use of the mark.  Specifically, Tony Stampley released an album called "Rebelution" on Trichord Records in 2000, Yami Bolo released an album called "Rebelution" on Zion High Records in 2003, Soul Rebels released an album called "Rebelution" on Barn Burner Music in 2004, Tanya Stevens released an album called "Rebelution" on VP Records in 2006, and recording artist Starratz released an album called "Rebelution" on Perris Records in 2006.  Stipulated Facts ¶¶ 5–8; Wolfe Aff. ¶ 8.  Moreover, more than twenty songs have the word rebelution in their title.  Wolfe Aff. ¶¶ 24–26, 34–39 (listing bands).[5]

Although defendants demonstrate the existence of various third-party users, they fail to provide any evidence regarding recognition of these artists by the relevant consuming public.  *See M2 Software*, 421 F.3d at 1087–88 (third-party uses can demonstrate that its "less likely that [plaintiff's] customers would associate [plaintiff's] products with those of [defendant], as opposed to other third parties.").  With respect to Yami Bolo, defendants present biographies, discographies, reviews and search results, but fail to present evidence regarding recognition amongst the relevant consuming public.  Wolfe Aff. ¶¶ 4, 9; *id.*, Exhs. 1–3, 11–16.  The same is true for the Soul Rebels, Tony Stampley and Starratz.  *Id.* ¶¶ 5–7; Exhs. 4–6.  For Tanya Stevens, in addition to biographies, discographies, reviews, interviews, newspaper articles, press releases and search results, defendants present evidence that her album was a top rated Reggae album in 2006, but little of this pertains to recognition amongst the relevant consuming public.  *Id.* ¶¶ 8, 13–20; *id.*, Exhs. 7–10, 17–34.  The evidence regarding visitors to Stevens' website is simply wrong, as it relates to www.myspace.com, the popular social networking site, not to Stevens' page on that site.  *Id.*, Exh. 35.  Although Stevens appears to be popular in the Carribean, the effect of Stevens' album—released contemporaneously with plaintiff's USPTO application for its mark—on the relevant consuming public here is unclear.

United States District Court

For the Northern District of California

*See id.*, Exh. 25 (September 14, 2006 Miami Music article about Stevens' reggae album named Rebelution), Exh. 26 (Reggae magazine discussing Stevens' album, but failing to discuss its relative popularity). Similarly, the evidence with respect to Bolo's website demonstrates it is ranked at number 7,876,919, not that seven million visitors have visited the site. Indeed, defendants' own evidence states that the site "gets little to no traffic." *Id.*, Exh. 11. However, his interview published in Rolling Stone magazine, which was not provided to the court, may indicate recognition.

The evidence presented suggests that plaintiff's mark was weakened; however, without evidence of the scope of use by third-parties, the degree to which plaintiff's mark was weakened by these users cannot be determined. Moreover, plaintiff presents evidence suggesting that these users are all little known, and consequently raises a factual question as to whether these users bear any degree of threat to the strength of its mark. Docket No. 113 (Stricchiola Supp. Dec.) ¶¶ 12–31 ("Based on how both search engines . . . presently generate search results, as well as the lack of web site promotion (and in fact lack of web site existence) of other music artists who have previously been associated with the term 'Rebelution,' I believe that the vast majority of confusion around the term Rebelution is generated by Defendant Pitbull's use of the term, as opposed to any other music artist's use of the term."). Since the mere existence of third-party users does not significantly reduce the strength of plaintiff's mark, this factor favors plaintiff at this juncture.[6]

B.      Proximity of goods

Consumers are more likely to be confused when "users of similar marks or names sell related goods." *Accuride*, 871 F.2d at 1536. In other words, the closer the parties are in competitive proximity, the higher the likelihood of confusion. For related goods, the public may mistakenly assume there is an association between the producers of the related goods even though no such association exists. *Sleekcraft*, 599 F.2d at 350. Both plaintiff and defendants offer the same type of goods and services: musical sound recordings and live musical performances based on a musical album that includes the word rebelution in its title.

Defendants argue that because they operate in a different genre of music than plaintiff—Latin flavored urban pop music as opposed to Cali-reggae or Roots music—their products

should not be considered related to or in close competitive proximity with plaintiff's goods. This characterization of the music industry at a fine granularity in order to create an artificial distinction between the plaintiff's and defendants' products is unpersuasive. The prevalence of fusion artists, or artists that cannot be easily categorized, further underscores this point. Distinctions between the parties' relative styles during live performances is similarly unpersuasive.

Even if defendants' bright-line characterization of musical genres is accepted, the relevant music-consuming public includes a subset that consumes music across genres. Defendants themselves market their album to reggaeton consumers because "a part [of Pitbull's] audience is the reggaeton audience." Docket No. 144 (Supp. Smith Dec.), Exh. C (Fuller Depo.) at 157:18–19; *see* Docket No. 104 (Smith. Dec.), Exh. 5 (Martinez Depo) at Exh. 6 (Phase One Marketing Plan) at 11 (Facebook banner advertisement for defendants that targets users who list reggaeton in their profiles; specifically targeting "Reggaeton Online" and "World Reggaeton" for advertising). Since reggaeton is derived from reggae, Fuller Depo. at 157:20–22, plaintiff's and defendants' markets overlap to some degree. Thus, this factor favors plaintiff because defendants market their products to a wide range of potential buyers, many of whom could also be consumers of plaintiff's music.

C.    Similarity of marks

Similarity of marks "is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351. Each mark must be considered as it is encountered in the marketplace, and similarities between the two marks will weigh more heavily than differences. *Id.* While the word rebelution does not have a dictionary definition, its connotation is obvious: it expresses a sense of rebellion and revolt. There is no evidence that the word is intended otherwise by the parties to this action.

There is no dispute that Perez uses the word rebelution as part of his album title. Defendants argue that the name of Perez's album is not simply "Rebelution," but rather, is "Pitbull starring in Rebelution." Although this difference is taken into account when considering the visual similarity of the marks, the importance of this difference is diminished because plaintiff has presented evidence suggesting that the album title is usually shortened to simply "Rebelution." *See, e.g.*, Perez Depo. at 99:3–101:7 ("The title of the album is Rebelution."); Fuller Depo. at 117:7–16 (same).

13

United States District Court

For the Northern District of California

Defendants further argue that because each of their uses of the word rebelution is alongside an image of Perez or his own mark, both of which are larger than the font used for the word rebelution, the consuming public could not be confused by defendants' use of the word.  *See Sleekcraft*, 599 F.2d at 351 (use of defendants' own mark, i.e., a housemark, alongside plaintiff's mark can reduce the likelihood of confusion).  Again, despite defendants' claim, evidence in the record reveals instances where defendants have used the word without the accompanying words "Pitbull starring in," *see* Docket No. 118 (Raissen Dec.), Exh.1 (screenshots of Pitbull's Myspace page), Exh.15 (screenshots of Pitbull's YouTube page), and also without both "Pitbull starring in" and Pitbull's name and image, *see id.*, Exh. 2 (screenshot of "AT&T Presents the Rebelution Tour"), Exh. 12 (Twitter announcements from AT&T using the word without reference to Pitbull).[7] Moreover, defendants admit that they advertised their products based on internet searches of only the word rebelution.  Supp. Smith Dec., Exh. B (Boghigian Depo.) at 112:7–11 (due to media company's efforts, a search for the word rebelution would lead to an advertisement for Pitbull).

Even if defendants' use of the word rebelution was always accompanied by the use of their own mark, "[s]imilarities weigh more heavily than differences."  *Sleekcraft*, 599 F.2d at 352.  Indeed, "the more closely related the goods are, the more likely consumers will be confused by similar marks."  *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1147 (9th Cir. 2002).  Given that both plaintiff and defendants create musical content, the consuming public could assume that Pitbull had joined the band Rebelution or could otherwise understand "Pitbull starring in Rebelution" or "The Rebelution Tour" as a joint venture between the parties.  Indeed, rap and reggae artists can, and do, perform at the same live event.  This is especially true with respect to festival-type concerts.  Thus, defendants' use of the phrase "Pitbull starring in Rebelution" could result in consumer confusion as to the association between Pitbull and the band Rebelution.  *See Brookfield Comm. Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1057–58 (9th Cir. 1999) (Lanham Act protects against many different forms of confusion); *cf. Miss Universe, Inc. v. Flesher*, 605 F.2d 1130 (9th Cir. 1979) (Miss U.S.A. pageant was protected from the Miss Nude U.S.A. pageant because association could demonstrate a likelihood of confusion).

Finally, defendants argue that their visual representation of the mark is distinguishable from the mark itself because the mark uses a stylized script whereas defendants use the word in small, simple block letters.  While this is true, a similar argument was rejected in *Sleekcraft*, where the Ninth Circuit held that even though the mark was often used in connection with a logo, "the word Sleekcraft is frequently found alone in trade journals, company stationery and various advertisements."  599 F.2d at 351.  Here, considering the mark as it is encountered in the marketplace by potential consumers, both parties' uses of the word appear in identical font on websites where both parties sell music and concert tickets.  Raissen Dec., Exh. 7 (results of a search for rebelution on Ticketmaster.com), Exh. 8 (results of a search for rebelution on Google.com); Docket No. 112 (Stricchiola Dec.) ¶¶ 22–25 (describing search engines' and vendor websites' confusion); *id.*, Exh. 5 (results of a search for rebelution on Ticketmaster.com), Exh. 7 (results of a search for rebelution on Amazon.com).  Therefore, as encountered in the online marketplace, where plaintiff has the exclusive right to use the mark for downloadable musical sound recordings, defendants' use of the word rebelution is visually similar enough to plaintiff's to cause consumer confusion.  *Contra Pump*, 746 F. Supp. at 1167–68 (finding stylistic differences important in a 1990 decision, which pre-dates the internet).

Additionally, since defendants' use of the word includes an identical spelling and is pronounced in the same way as the mark, there is also a likelihood of confusion based on sound.

In sum, defendants' use of the word rebelution apart from the Pitbull housemark has a potential for causing consumer confusion.  Even where the housemark is used, the appearance of an association between Pitbull and the band Rebelution could cause consumer confusion.  And as used in electronic commerce, defendants' use of the word rebelution is at least similar, if not identical, to plaintiff's use, which may cause confusion amongst online purchasers.  This factor favors plaintiff.

D.     Actual confusion

Evidence that use of a mark or name has already caused actual confusion as to the source of a product or service is "persuasive proof that future confusion is likely."  *Sleekcraft*, 599 F.2d at 352.  However, actual confusion is not necessary to a finding of likelihood of confusion under the Lanham

United States District Court

For the Northern District of California

1  Act. *New West Corp.*, 595 F.2d at 1201.

2        To demonstrate actual confusion, plaintiff lists instances where fans questioned the band or

3  its employees regarding the association between the band and Pitbull.  Defendants' Exhibits, Exh. B

4  (Interrogatory Responses) at 9–11.  Specifically, according to plaintiff's responses to interrogatories,

5  the band's fans asked them about "The Rebelution Tour" and sought to know whether the band was

6  on tour with Pitbull or vice-versa.  *Id.*  Others queried the band as to whether it was related to

7  Pitbull.  *Id.*  This evidence, which was not presented under oath by either the speaker or the listener

8  with personal knowledge, is inadmissible.[8]  However, such queries, especially those by Rebelution

9  fans regarding the tour—who undoubtedly form plaintiff's target market—could demonstrate that

10  prospective purchasers of the band's concert tickets are confused.

11        The other instances of purported actual confusion are not persuasive.  Firstly, dismay over

12  Pitbull's use of the word rebelution is not evidence of actual confusion; instead, it displays a lack of

13  confusion.  *Id.* ("[d]id you know the artist Pitbull is trying to steal your name? Not cool.").

14  Secondly, any confusion amongst defendants themselves, although telling, is not persuasive because

15  there is no evidence that they are prospective customers of plaintiff's music.  *See* Supp. Smith Dec.,

16  Exh. E (Leak Depo.) at 183:13–185:2; Boghigian Depo. at 162:8–22; Fuller Depo. at 220:7–19

17  (three defense witnesses—including persons most knowledgeable about marketing and use of the

18  mark—testified that they could not determine whether particular search results referred to plaintiff

19  or to defendants).  Finally, evidence of confused websites does not demonstrate actual confusion, as

20  those websites are also not prospective consumers of plaintiff's goods.  *See* Raissen Dec. ¶ 5d

21  (Ticketmaster.com shows concert dates for defendants' tour when the word rebelution is searched),

22  ¶ 5a–b (Billboard.com shows defendants' album with the heading "Pitbull Ready for a Rebelution"

23  on plaintiff's "Artist Feed" page).  Although none of this evidence demonstrates actual confusion by

24  prospective customers, it is nonetheless probative.  For instance, the websites' confusion could lead

25  to confusion amongst the relevant consuming public.[9]

26        There is no evidence of actual confusion because plaintiff failed to appropriately present its

27  evidence; however, this absence is generally not noteworthy.  *Brookfield*, 174 F.3d at 1050.

28

16

United States District Court

For the Northern District of California

E.   <u>Marketing channels</u>

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353.  Accordingly, plaintiff argues that defendants' marketing channels overlap its own because both parties use the internet to market their services.  Some use of the internet for marketing does not, in itself, constitute overlapping marketing channels. *Entrepreneur Media*, 279 F.3d at 1151. Instead, the proper inquiry relates to "whether both parties use the Web as a *substantial* marketing and advertising channel . . . and whether the parties' marketing channels overlap in any other way." *Id.* (emphasis in original).

The parties use both the internet and traditional channels to market and advertise their products.  Specifically, Pitbull and Rebelution both extensively utilize internet search engines such as Google, Yahoo and YouTube, online retailers such as iTunes and Amazon, and social networking sites such as Myspace, Twitter and Facebook. *See generally* Docket No. 117 (Carey Dec.); Raissen Dec.; Phase One Marketing Plan.  Moreover, both make use of Ticketmaster, the popular ticket vendor, and perform concerts at similar or identical venues. *Id.*

Defendants argue that reggae albums are marketed in different ways than hip-hop or pop albums.  Defendants' Exhibits, Exh. E (Llord Aff.) ¶ 12 (noting differences in marketing activities based on size of marketing budget); *id.*, Exh. F (Lucas Aff.) ¶¶ 11–12 (describing marketing activities of major record labels with respect to pop artists).  Again, defendants' attempt to minimize the effect of the internet and paint the music marketplace as a divided world where consumers ignore cross-genre marketing is unpersuasive.  Moreover, defendants' legal support for this characterization pre-dates the widespread commercialization of the internet, and is therefore distinguishable. *See, e.g.*, *Tsiolis*, 946 F. Supp. 1344.  Gone are the days when music consumers went to the neighborhood record store to browse an aisle carefully organized into genres by a music afficionado. Tower Records has been replaced by iTunes, traditional marketing campaigns by Facebook banner ads and YouTube videos, and both plaintiff and defendants make substantial use of these online tools.  Both also make substantial use of traditional marketing, such as live concerts, and do so at identical or similar venues.  Thus, this factor weighs in favor of plaintiff.

17

United States District Court

For the Northern District of California

F.      Degree of care

Likelihood of confusion is determined from the standpoint of a "reasonably prudent consumer." *Brookfield*, 174 F.3d at 1060. Expectations of the reasonably prudent consumer are largely based on her level of sophistication and the nature of the goods and services involved. For example, "[w]hen the goods are expensive, the buyer can be expected to exercise greater care in his purchases" and "[w]hen the buyer has expertise in the field, a higher standard is proper." *Sleekcraft*, 599 F.2d at 353.

The parties have produced declarations demonstrating the extent to which consumers may or may not be confused by defendants' use of the word rebelution. *See* Stricchiola Dec. ¶¶ 22–25 (describing search engines' and vendor websites' confusion); Llord Aff. ¶ 11 (describing record stores' purchasing behavior); Defendants' Exhibits, Exh. K (Jacobi Aff.) ¶¶ 11–13 (describing information provided to consumer, but not searching or purchasing habits). The conclusory declarations; however, are rife with unwarranted logical leaps, and do not present evidence regarding the actual purchasing behavior of music consumers, especially with respect to individual songs.

Music consumers are generally discriminating customers. In the physical record store context, a purchaser is unlikely to accidently acquire the wrong album as she likely investigates the album art and scans the track list prior to shelling out $13.96. Purchasers may, however, behave differently on the internet, where it is easy to click on a link on a mobile phone to instantly download a searched-for song for a mere 99 cents. *Brookfield*, 174 F.3d at 1060 ("when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely."). Therefore, at this juncture, this factor does not support either plaintiff or defendants.

G.      Defendants' intent

If an alleged infringer "adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities." *Pac. Telesis v. Int'l Telesis Comms.*, 994 F.2d 1364, 1369 (9th Cir. 1993) (quotation omitted). Defendants contend that prior to this lawsuit Perez had never heard of

18

1   the band Rebelution, and therefore could not have knowingly adopted plaintiff's mark.  Plaintiff

2   does not refute this contention; instead it argues that the Associate Director of Urban Marketing for

3   Sony, who was familiar with both Billboard and iTunes charts when she chose the album name,

4   Fuller Depo. at 40:14–19, must have known of the band Rebelution.  This evidence, even if true,

5   does not demonstrate that defendants intended to benefit from the band's reputation, or that they

6   intended to deceive the consuming public.  In this instance, *Pump* is on point because the "lack of

7   evidence is consistent with common sense—why would a world-famous band with proven market

8   power rely on the name of an unknown [band] to help promote its product?"  746 F. Supp. at 1170.

9   While the band Rebelution is not unknown, there is no dispute that Pitbull has had significantly

10  more commercial success than Rebelution.  Therefore, it is unlikely that defendants used plaintiff's

11  mark to tread on plaintiff's goodwill.  This factor favors defendants.  Good faith, in contrast to bad

12  faith, is not very probative with respect to the likelihood of confusion.  *Sleekcraft*, 599 F.2d at 354.

13        H.      Likelihood of expansion

14        "A strong possibility that either party may expand his business to compete with the other will

15  weigh in favor of finding that the present use is infringing."  *Id.*  Since the parties already operate in

16  the same marketplace, there is little likelihood that defendants could expand their business to further

17  compete with plaintiff.[10]  Although this factor superficially favors defendants, it warrants little

18  weight since defendants already compete with plaintiff in the music marketplace, both online and

19  off.

20        I.      Summary

21        In sum:  1) plaintiff's mark is moderately strong, but may have been weakened by third-party

22  users; 2) plaintiff and defendants are competitors because their principal line of business does not

23  vastly differ; 3) Perez's album name resembles plaintiff's mark; 4) no actual confusion exists; 5) the

24  parties' marketing channels substantially overlap; 6) the degree of care exercised by prospective

25  purchasers is unclear; 7) defendants did not act in bad faith; and 8) the parties do not intend to

26  expand their businesses to more directly compete with each other.

27        With the aid of these findings, the court turns to the ultimate question posed by *Sleekcraft*:

28

19

United States District Court

For the Northern District of California

1    the likelihood of confusion as to the source of the product.  Defendants are correct that the word

2    rebelution is used by various third-parties, and this issue may ultimately pose a significant hurdle for

3    plaintiff in demonstrating the strength of its mark.  However, defendants did not met their burden

4    with respect to this issue, and, in any event, the strength of the mark is of diminished importance

5    where the products involved are closely related and the infringing use is similar.  *Brookfield*, 174

6    F.3d at 1059.  At bottom, defendants undisputedly incorporate the word rebelution, as used in

7    plaintiff's mark, on the cover of their musical recording, and also market their musical recording in a

8    similar fashion as plaintiff.  Although no evidence of actual confusion or degree of care was

9    presented, given the fluid preferences of the ordinary consumer of popular music, a reasonable jury

10   could find that defendants' use of the word rebelution is "likely to confuse an appreciable number of

11   people as to the source of the product."  *Entrepreneur Media*, 279 F.3d at 1151.[11]  Summary

12   judgment in favor of defendants must therefore be denied.

13           In the internet context, "the three most important *Sleekcraft* factors in evaluating a likelihood

14   of confusion are (1) the similarity of the marks, (2) the relatedness of the goods or services, and

15   (3) the parties' simultaneous use of the Web as a marketing channel."  *Interstellar Starship Servs,*

16   *Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir. 2002).  When these three factors suggest confusion is

17   likely, the other factors must "weigh strongly" against a likelihood of confusion in order for

18   defendants to prevail.  *Brookfield*, 174 F.3d at 1058.  Since each of these three factors favors

19   plaintiff, and the remaining factors do not weigh strongly against a likelihood of confusion,

20   summary judgment with respect to defendants' use of the word rebelution over the internet is denied.

21

22   CONCLUSION[12]

23           For the foregoing reasons, defendants' motion for summary judgment is DENIED.

24           IT IS SO ORDERED.

25

26   Dated:  July 29, 2010                                      _____

                                                               MARILYN HALL PATEL
27                                                             United States District Court Judge
                                                               Northern District of California
28

**ENDNOTES**

1. The band Rebelution and plaintiff are referred to interchangeably in this order. Perez and Pitbull are also referred to interchangeably in this order.

2. Defendants failed to seek leave to file an oversized opening brief. *See* Docket No. 131 (27-page memorandum of points and authorities). Defendants are also reminded to follow applicable time limits. *See* Docket No. 171. Future attempts to circumvent the local rules may be met with sanctions.

3. Defendants argue that plaintiff cannot demonstrate its mark is famous. This argument conflates the standard for trademark dilution with that of trademark infringement. *Compare* 15 U.S.C. § 1125(c) (referring to dilution), *with id.* § 1125(a) (referring to infringement). For purposes of infringement, plaintiff need not demonstrate that its registered mark is famous. Plaintiff does not claim trademark dilution; consequently, defendants' arguments regarding dilution are misplaced.

4. *Cmte for Idaho's High Desert v. Yost*, 92 F.3d 814 (9th Cir. 1996), is inapposite because it discussed ownership, not strength of the mark. *Id.* at 821 ("[s]o long as plaintiff proves rights superior to defendant, that is enough. Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world." (quotation and citation omitted)).

5. Moreover, the band "New Rebelution" released a reggae album in 2007, Stipulated Facts ¶ 9, but now appears to be defunct. A band named "Southern Rock Rebelution" sold music in connection with festivals, but was disclosed to the USPTO before plaintiff's application was approved. *Id.* ¶ 10.

6. Defendants argue, as a defense, that plaintiff does not have exclusive rights to the mark because of the existence of senior users. Plaintiff's registered mark, however, provides at least some rights to use the mark in association with pre-recorded compact disks. The issue here is the strength of the mark, and consequently the likelihood of confusion, in light of the other users.

7. Defendant Sony negotiated a contract with AT&T that referenced "the applicable usage rights to the name and trademarks for Artist [i.e., Pitbull] and Artist's album 'Rebelution'," which can demonstrate a tacit approval by Sony of AT&T's use of the word rebelution. *See* Supp. Smith Dec., Exh. D2 (Eng Depo. Exhibit) at Sony713. Moreover, AT&T maintains that "AT&T, a mere passive sponsor, received approval from Sony with respect to all uses of 'Rebelution.'" *Id.*, Exh. D1.

8. Defendants' objections are overruled. Questions by plaintiff's followers are not assertions, and therefore not hearsay. Nor is this evidence irrelevant, overly prejudicial or argumentative.

9. Defendants also argue that plaintiff did not suffer any harm as a result of their use of the word rebelution. In the absence of actual confusion, direct monetary harm may not yet exist. Actual harm, however, is not determinative of the likelihood of confusion analysis.

10. Plaintiff provided no support for its argument that defendants' use of the word rebelution in connection with AT&T cell phones represents an expansion into a common market.

11. Due to this holding, the court does not reach the initial interest confusion issue.

12. To the extent evidence objected to by defendants is included in this order, the objection is overruled. And since plaintiff is the prevailing party, all of plaintiff's objections are denied as moot. *See* Docket Nos. 155–60, 162, 167, 171.